GRIFFIN, J.
Ann Smith a/k/a Annie May Smith [“Smith”] appeals an order finding her incompetent and appointing a limited guardian of her person and property.
The petitioner below, Nathan Smith [“Nathan”], is Smith’s sixty-four-year-old stepson. On September 17, 2004, Nathan filed a petition seeking to be appointed plenary guardian over Smith’s person and property. The petition alleged that Smith was incapacitated due to her “doctor’s diagnosis of dementia of an Alzheimer’s type.” It asserted that Smith was seventy-nine years old and had assets valued in excess of $191,250.18.[1] When the petition was filed, Smith was apparently residing with her step-granddaughter, Cassandra Dinkins (who is Nathan’s niece), in a home Smith owns in Apopka. Nathan, who had been handling Smith’s finances under a power of attorney from Smith, filed the petition after learning that Smith had purchased a van for her step-granddaughter at a cost of more than $11,000. Nathan also filed a petition seeking to be appointed emergency temporary guardian on the same grounds.
After counsel was appointed to represent Smith, the court appointed a three-member examining committee to determine Smith’s competency. All three members of the committee had filed written reports with the court by October 18, 2004, in which they recommended appointment of a plenary guardian for Smith. At a hearing on October 20, 2004, the court appointed a professional guardian, Teresa Barton [“Barton”], to serve as temporary guardian and determined to appoint yet another doctor to examine Smith. The fourth member appointed to the examining committee submitted his report to the court on November 4, 2004. Like the other members of the committee, he recommended appointment of a plenary guardian for Smith.
The court held a hearing on the petition on January 7, 2005. All four members of the examining committee testified at the hearing, and their reports were entered into evidence. All four members testified that Smith suffered from dementia, and all recommended guardianship.
Smith was called to the stand and questioned by the attorney for the temporary guardian. She exhibited some confusion during direct examination, for example, that the current date was February of 1936 or 1938 and was unsure of her lawyer’s name. She said she got in touch with her lawyer after her husband died in 1960 or 1969, even though her husband had died in 1999. Smith said she was good at math and was asked to do some simple mathematical calculations. When asked to subtract nineteen from thirty-six, she came up with 725. When Smith was asked if she had given any money to her attorney in connection with the hearing, she said she did not know how much.
Smith called a psychologist, Dr. Charles English, who spent approximately four *402 hours examining her, to testify. Dr. English is a licensed mental health therapist. He prepared a written report in which he concluded that Smith was perfectly capable of doing such things as entering into contracts, managing her property, and consenting to medical treatment. He thought that her responses were normal for “an African American woman of her age and status in life.” He saw no need for treatment or intervention unless she chose to obtain assistance with her affairs. He testified that he saw no problems with Smith’s short-term memory and thought she was capable of making her own decisions. Dr. English felt that the others who had examined Smith were “talking to another person” and he disagreed “wholeheartedly” with how they evaluated her. He said that she had confided that she was never really pleased with Nathan’s behavior, while she was comfortable with her step-granddaughter, Cassandra. Dr. English said that if Smith found that she was unable to handle her own financial affairs, she could hire someone she trusts to do that for her. He said that the testing he had done was designed to identify major mental disorders, personality disorders, psychoses, and things of that sort. It is not really geared toward dementia. However, his assessment was sufficient to determine that she was not suffering from dementia.
Milton Collins [“Collins”], a licensed psychotherapist and social worker, worked in nursing homes for over ten years, specializing in mental health treatment and support services for the elderly. He saw Smith on two occasions and performed a geriatric assessment on her. He submitted his own report in which he determined that Smith was competent to manage all of her own affairs. Among other things, he stated in the report that she was “medically stable,” as well as “alert, cooperative, [and] oriented,” and said he thought she demonstrated “a great deal of common sense, given her age and limited education.” He stated that he was “confident” of her ability to “mentally and intellectually recognize who can best assist her in her daily living skills and to assist her in making sound common sense decisions that our (sic) in her best interest.” He noted that she was unhappy with her stepson’s behavior and felt comfortable that her step-granddaughter was looking after her interests. At the hearing, Collins explained he had, seen Smith on two occasions. He found that she was “fairly” oriented to time and place and very much oriented to person. He thought she may have been misdiagnosed with dementia or Alzheimers because of the failure to take into account various psycho-social and cultural factors, such as her fourth grade education. In his opinion, she was normal.
The court executed a written order determining that Smith was incapacitated and finding that a limited guardian of Smith’s person and property should be appointed. The order determined that Smith was incapable of making virtually all decisions about her person and property, except that it found she had the ability to determine her residence, to vote, and to regulate her social environment and other social aspects of her life. Barton.was appointed to serve as Smith’s limited guardian.
Smith contends on appeal that the evidence presented in this case was insufficient to support a finding of incapacity by “clear and convincing evidence.” See In re Bryan, 550 So.2d 447 (Fla.1989). She acknowledges that all four members of the examining committee found that she was incompetent to proceed, but notes that the reports contain certain internal inconsistencies, such as statements that she was “oriented to person and place,” her speech was “organized,” she did not appear to be *403 suffering from psychosis, and she had good long-term memory. She further notes that both experts hired by the defense found her competent to proceed, and there was no medical evidence to support a finding of incompetency. Where, as here, the experts reach such contradictory results, she argues that as a matter of law the evidence should be deemed insufficient to establish incompetency by clear and convincing evidence.
Although the two experts hired by the defense disagreed with the conclusions drawn by the examining committee, this conflict in the evidence does not preclude a finding that the evidence of incompetency was clear and convincing. Nor would conflicts in the evidence require the court to find a lack of clear and convincing evidence. A similar problem existed in Manassa v. Manassa, 738 So.2d 997, 997 (Fla. 1st DCA 1999). In rejecting the argument that conflicts in the evidence precluded a finding of incompetency, the court explained:
[2] In the case at bar, the record is replete with conflicting medical reports and testimony regarding Manassa’s competence. It is the purview of the trial court to determine the credibility and weight of the evidence. See LeWinter v. Guardianship of LeWinter, 606 So.2d 387, 388 (Fla. 3d DCA 1992). This court will not reweigh the testimony and evidence, or substitute its judgment for that of the trier of fact. See In re Adoption of Baby E.A.W., 658 So.2d 961, 966 (Fla.1995). The trial court noted that, with the exception of the examining committee which has seen hundreds of cases to determine incapacity, the medical reports were from physicians who are not professionals in mental health care proceedings. The examining committee opined that Mr. Manassa was incapacitated, and it recommended appointment of a plenary guardian. The trial court weighed the evidence and accepted the recommendation of the examining committee.
Id. at 997-998.
In Shaw v. Shaw, 334 So.2d 13 (Fla.1976), the court said that appellate courts have a right to reject “improbable testimo- • ny or evidence.” Id. at 16. However, this case does not involve improbable testimony or evidence. It involves multiple experts with competing views, and the court found the evidence of the four experts appointed by the court to be “clear and convincing evidence,” which the court properly could do.
AFFIRMED.
SAWAYA and TORPY, JJ„ concur.

. According to the guardian’s verified inventory, Smith's assets were valued at $305,873.96.